United States District Court
Southern District of Texas
**ENTERED**
September 13, 2023
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| CESAR A. AGUIRRE, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 7:22-CV-169 |
| | § | |
| KILOLO KIJAKAZI, | § | |
| | § | |
| Defendant. | § | |

## AMENDED[1] REPORT AND RECOMMENDATION

Plaintiff Cesar A. Aguirre, proceeding with retained counsel, filed this action pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of Social Security's denial of disability benefits. Plaintiff's application alleged that he became disabled in 2020 due to a myriad of physical and mental ailments; including knee pain, back problems, hypertension, high cholesterol, abdominal pain, arthritis, depression, anxiety, and insomnia. (*See* Tr. 35, 265, 275.)[2] An Administrative Law Judge (ALJ) found that, while some of Plaintiff's physical conditions limited him to a restricted range of sedentary work, he is still capable of performing jobs that exist in significant numbers, and thus he is not disabled.

---

[1] On July 27, 2023, the undersigned entered a report and recommendation, recommending that Plaintiff's motion for summary judgment (Docket No. 12) be denied, that Defendant's motion for summary judgment (Docket No. 13) be granted, that the Commissioner's decision be affirmed, and that this action be dismissed. (*See* Docket No. 15.) Upon review, the District Court found that the "Magistrate Judge's [Step Five] significance analysis does not withstand de novo review." (Docket No. 17, at 2 (analyzing Plaintiff's third point of alleged error).) As such, the District Court has rejected that report and returned it to the undersigned for further consideration. (*Id.*) This amended report follows. (*See infra* Part II.E.)

[2] The Commissioner has filed a transcript of the record of the administrative proceedings (Docket No. 10), which will be cited as "Tr." The specific page of the administrative transcript will be cited by reference to the page numbers in bold typeface located in the bottom right corner of the transcript pages.

In challenging the Commissioner's denial of benefits, Plaintiff alleges that the ALJ erred in the following three ways: 1) by failing "to apply the correct legal standard for the severity of Plaintiff's impairments"; 2) that the "ALJ's residual functional capacity finding is not supported by substantial evidence"; and 3) by failing to resolve conflicts in the vocational expert's testimony. (Docket No. 12, at 5, 9, 12.)  Pending before the Court are the parties' cross motions for summary judgment.  (Docket Nos. 12, 13.)

A federal court may review the Commissioner's denial of benefits only to determine whether it is supported by substantial evidence and whether the proper legal standards were applied; a court may not re-weigh the evidence or substitute its judgment for the Commissioner's. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).   After carefully considering the record in light of the deferential standard of review that applies, the undersigned concludes that Plaintiff's claim lacks merit.

The record shows that the ALJ's careful and thorough written opinion shows that she did not commit reversible error in her assessment of the severity of Plaintiff's impairments.   In addition, the medical evidence (and other evidence of record) shows that the ALJ's RFC determination is supported by substantial evidence.  Finally, as to the ALJ's Step Five findings, she did commit reversible error in her reliance on the vocational expert's testimony to support her finding that Plaintiff is able to perform work that exists in significant numbers in the national economy.  Stated another way, the ALJ's Step Five findings are not supported by substantial evidence.  Accordingly, for the reasons discussed further below, it is recommended that the Commissioner's ultimate decision be rejected, reversed, and that this action be remanded for further proceedings.

## I.  BACKGROUND

In February 2020, Plaintiff applied for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under sections 216(i) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and section 1614(a)(3)(A) of Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f, respectively.  (*See* Tr. 12, 245.)  In his application, Plaintiff alleged that he became disabled on March 22, 2019; however, he later amended his alleged onset date to January 1, 2020.  (Tr. 35, 245.)  He identified knee pain, back problems, hypertension, high cholesterol, abdominal pain, arthritis, depression, anxiety, and insomnia as the conditions that prevented him from working.  (*See* Tr. 265, 275.)  Plaintiff's applications were denied initially and on reconsideration.  (Tr. 123-24, 161-62.)  Plaintiff then requested a hearing before an ALJ, which was held on November 22, 2021.  (Tr. 31, 190.)  The ALJ issued a written decision on December 21, 2021, finding that Plaintiff was not disabled because he was able to perform a limited range of sedentary work that included jobs existing in significant numbers in the national economy.  (Tr. 12-24.)

Plaintiff filed a request with the Social Security Administration's Appeals Council to review the ALJ's adverse decision.  (Tr. 7, 242-43.)  The Appeals Council denied review, rendering the ALJ's decision the Commissioner's final decision for purposes of judicial review.  (Tr. 1.)  In considering Plaintiff's challenge to the ALJ's decision, the evidence in the record will be summarized.[3]

## A.    Education, Work Experience, and Activities

---

[3]   The Court must "scrutinize" the record to determine whether the ALJ's decision is supported by substantial evidence.  *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).  The undersigned has thoroughly reviewed the medical records and other evidence, which will be summarized above.

At the time of the administrative decision, Plaintiff was 47 years old.  (*See* Tr. 23-24.)

Plaintiff can read, write, and understand English, but only completed his education up to the 9th

grade.[4]  (Tr. 274, 276.)  Plaintiff's past work experience has varied; however, most recently his

employment included working as a custodian (1994-2006), security guard (2007), and general

laborer (2013-2015).  (Tr. 277.)  As a "laborer," Plaintiff walked or stood approximately seven

hours a day, handled small and "big objects" six hours a day, but rarely sat down.  (Tr. 310.)  He

also frequently lifted objects weighing more than 50 pounds.  (*Id.*)

Plaintiff is married and lives with his wife.  (Tr. 288, 300.)  When he filed his disability

application, he described his "illnesses, injuries, or conditions" as follows:

> My knees cause me pain.  I can't do a lot [like] stand, walk, bend.  My stomach is
> all messed up.  I have a lot of pain.  I have had three surgeries.

(Tr. 300.)  Plaintiff helps take care of his disabled daughter.  (Tr. 301.)  The pain he experiences

affects his sleep, as well as his ability to work.  (*Id.*)  He is unable to stand for long periods and

will fall if he "puts pressure on both knees."  (Tr. 302.)  Plaintiff is able to prepare his own meals

but most of the cooking is done by family members.  (*Id.*)  Plaintiff's wife sometimes has to remind

him to take his medications.  (*Id.*)  Plaintiff drives and spends time with friends.  (Tr. 304.)

However, when he is depressed he does not want to be bothered.  (*Id.*)

Plaintiff ambulates with a cane.  (Tr. 306.)  He is able to walk 15 minutes before needed to

take a short break.  (Tr. 305.)  According to Plaintiff, his conditions affect his ability to lift, squat,

bend, stand, walk, sit, kneel, and climb stairs.  (*Id.*)

Plaintiff's wife filed a "Function Report – Adult – Third Party," which is largely consistent

with the "Function Report" that was filed by Plaintiff.  (*Compare* Tr. 288-98, *with* Tr. 300-07.)

---

[4] Plaintiff's education may not have proceeded past the seventh grade.  (*See* Tr. 36, 729, 869.)

According to her, Plaintiff "suffers of insomnia and complains of pain to both knees," is depressed and forgetful, but is able to do "light and limited house chores." (Tr. 291-92.) Plaintiff is able to "throw [the] trash" and shop for groceries. (Tr. 293.) In addition, Plaintiff helps to take care of his grandchildren by taking them outside and supervising them. (Tr. 295.)

**B.      The Medical Evidence**

Plaintiff's medical records date back to 2015. (*See* Tr. 346-47.) Although Plaintiff originally alleged that his onset disability date was in early 2019, he now alleges that he has been unable to work since January 1, 2020. To be sure, Plaintiff's medical history reflects a myriad of both physical and mental ailments. In fact, in his disability application he identified knee pain, back problems, hypertension, high cholesterol, abdominal pain, arthritis, depression, anxiety, and insomnia as the conditions that prevented him from working.

However, the primary medical issue that Plaintiff alleges prevents him from working is his right knee. (*See* Tr. 38.) In addition, Plaintiff does not challenge the ALJ's decision as it relates to all of his ailments. As such, this summary of the medical evidence will focus on those impairments that are relevant to Plaintiff's application for disability benefits and, more specifically, to those impairments that are most relevant to his alleged points of error.

1.      Right Knee Issues

In January 2015, Plaintiff was working for the City of Donna animal control when he suffered an on-the-job injury to his right knee while trying to corral a loose horse. (Tr. 353.) After he "roped the horse he was dragged and he felt a pop in his right knee." (*Id.*) This resulted in instability, pain, and swelling in his right knee, along with an unsteady gait. (Tr. 355.) Plaintiff was referred for an X-ray and MRI of his right knee, which showed a "large radial tear on the medial meniscus," an "intrasubstance tear . . . of the lateral meniscus," "moderate joint effusion,"

"soft tissue edema," and "mild degenerative changes." (Tr. 347.) Based on this, Plaintiff "underwent right knee arthroscopic surgery on February 11, 2015." (Tr. 350; *see* Tr. 923.) However, the surgery did not result in "maximum medical improvement." (Tr. 350.) Following this surgery, Plaintiff received physical therapy from Performance Therapeutics, where he continued to report pain in his right lower leg, difficulty walking, but overall his condition seemed to be "improving." (Tr. 642-709, 921.)

He continued to experience pain and stiffness in his right knee. (Tr. 916.) On August 20, 2015, Plaintiff had another MRI of his right knee which showed tears in the meniscus, "questionable postoperative changes," a "tiny joint effusion," and a "focal bone marrow edema." (Tr. 350, 563.) As such, Plaintiff underwent an "arthroscopic lateral meniscectomy on October 1, 2015." (Tr. 350, 545-46.) This was followed by "fourteen sessions of physical therapy." (Tr. 350.) In fact, Plaintiff was "pleased with the progress he [was] making in the rehabilitation." (Tr. 896, 899 (Plaintiff's "knee is doing better with therapy.").) On March 4, 2016, he had "full extension" of his right knee and was ambulating without a cane. (Tr. 893.) The next month, he "was released to regular duty." (Tr. 350.) He continued to improve and on May 20, 2016, a physical examination showed "excellent range of motion" in his right knee and a "[n]ormal gait pattern." (Tr. 890.)

On July 27, 2016, several months after his second knee surgery, Plaintiff reported "popping" and "mild pain" in his right knee. (Tr. 350.) He stated that he was using "a brace for work" and taking meloxicam[5] for the pain occasionally. (*Id.*) Upon exam his right knee showed "no right knee effusion," "no laxity," and only "mild MCL and ACL strain." (Tr. 351.)

---

[5] Since 2015, Plaintiff has been prescribed meloxicam and tramadol, and in 2019 he also began taking gabapentin. (*See* Tr. 355, 378, 973.) Meloxicam is a nonsteroidal anti-inflammatory drug that is prescribed to "relieve signs and symptoms of osteoarthritis or rheumatoid arthritis."

Although the medical records beyond 2016 are scarce,[6] Plaintiff continues to complain of pain in his right knee, "mostly anterior." (Tr. 887.) On April 6, 2018, he stated that "[h]is main concern is pain in the right knee"; however, he was not ambulating with any assistance. (Tr. 887-88 ("[n]o cane).) An X-ray of his right knee at that time revealed "mild patella femoral osteoarthritis." (Tr. 888.)

On September 4, 2020, a state agency physician, Dr. Leigh McCary, reviewed Plaintiff's medical records and performed a residual functional capacity (RFC) assessment. (Tr. 93-104.) Dr. McCary determined that Plaintiff had the ability to do the following: lift and/or carry 10 pounds frequently and 20 pounds occasionally; sit for 6 hours out of an 8-hour workday; stand or walk for 2 hours out of an 8-hour workday; and push or pull without limitation. (Tr. 99.) She also found that Plaintiff had the following postural limitations: "occasionally" climbing, balancing, kneeling, crouching, and crawling. (Tr. 99-100.) Dr. McCary concluded that Plaintiff's alleged subjective limitations "are [only] partially consistent with" the medical evidence of record. (Tr. 101.) On January 29, 2021, another state agency physician, Dr. Yondell Moore, reviewed Plaintiff's medical records. (Tr. 131-139.) Dr. Moore agreed with the residual function capacity assessment by Dr. McCary. (Tr. 136-39.)

2.    Mental Health Issues

As noted, Plaintiff alleges that depression and anxiety are the two primary mental health conditions that prevent him from working. There is little medical evidence in the record addressing

---

NURSING 2008 DRUG HANDBOOK 386 (28th ed. 2008). Tramadol is prescribed to treat "moderate to moderately severe pain." *Id.* at 416. Gabapentin is prescribed to treat "pain from diabetic neuropathy." *Id.* at 437.

[6] For example, in 2015 Plaintiff repeatedly presented to the Donna Medical Clinic for treatment regarding his right knee, which include the following:
- Three visits in 2015 – pre-surgery (Tr. 353-61, 737-45, 1018-25); and
- Eight visits in 2015 – post-surgery (Tr. 362-91, 746-75, 945-54, 1007-17).

Plaintiff's mental health diagnosis.  To be sure, there is some evidence in the medical record that is relevant to Plaintiff's mental health.  For example, on June 19, 2015, Plaintiff stated that due to the injury he sustained to his right knee he was experiencing both depression and anxiety.  (Tr. 869.)  In addition, on October 26, 2019, while being evaluated for "chest pain," Plaintiff "denies anxiety" but a "review of symptoms" revealed that he experienced anxiety and sleeping problems. (Tr. 476; *see also* Tr. 435 (Plaintiff presented with "moderate" insomnia that has lasted one month").)  Similarly, in May 2020, Plaintiff was experiencing a "nervous anxious nauseous feeling in his stomach," but he "refused [a] psychology referral."  (*See* Tr. 961.)

However, the bulk of Plaintiff's medical records reflect the absence of depression and anxiety, including the following:

- No anxiety (Tr. 353, 356, 359, 362, 365, 368, 476);

- No anxiety and no depression (Tr. 372, 376, 382, 385, 389, 392, 396, 401, 409, 414, 418, 423, 427, 431, 439, 443, 448, 876, 880, 942, 956, 966, 1139); and

- Appropriate mood and affect (Tr. 354, 357, 360, 363, 373, 377, 383, 386, 390, 393, 397, 402, 407, 411, 416, 420, 425, 429, 433, 436, 441, 445, 478, 878, 943, 957, 961, 964, 1141).

On October 21, 2020, Mario Tovar, Ph.D., the psychological consultative examiner, performed a "clinical interview with [a] mental status examination" of him.  (Tr. 727-31.)  Dr. Tovar observed that Plaintiff displayed a "steady gait but walked slow."  (Tr. 727.)  Plaintiff's primary complaint was that he "had knee surgery," but he "shared that he was diagnosed with Depression and Anxiety, . . . Hypertension, High Cholesterol, Borderline Diabetes, and that he has Chronic Pain due to his surgeries and his knee problems."  (Tr. 728.)

According to Plaintiff, his episodes of depression last "2-3 days" in which he feels "sad for most of the day, most days than not, every week." (*Id.*) "During those times, [he experiences] [d]ecreased energy, decreased motivation and interest in doing things that he would normally do, decreased appetite, feelings of worthlessness, and problems with concentration." (*Id.*) He denied experiencing "Manic or Hypomanic Episodes" and he also "denied having problems with Anger Management." (*Id.*) He believes that due to his depression he "is unable to complete tasks." (Tr. 729.)

Furthermore, he stated that he developed anxiety after he developed an upset stomach from prescription medication; however, "after this got resolved, he does not have problems with [anxiety] anymore." (Tr. 728.) "He denied experiencing symptoms consistent with a Specified Anxiety Disorder." (*Id.*)

Plaintiff stated that during the day he "stays home and takes care of his daughter and his grandchildren." (Tr. 728.) "[H]e is able to drive, to cook, and to manage money, and he expressed he is able to do his basic ADLs without assistance." (*Id.*) Plaintiff "has some friends" and he "gets along well" with others. (Tr. 729.) His "[l]evel of intelligence appeared to be average" even though he only "went to school up to the 6th grade in the U.S." (Tr. 729-30.)

Throughout the evaluation Plaintiff was cooperative and displayed a positive attitude. (Tr. 729.) His "thought process appeared to be concrete in nature," and he denied experiencing any hallucinations. (Tr. 729-30.) Plaintiff described his mood as "OK," and he "affect appeared to be serious." (Tr. 730.) He "was oriented to time, place, person and situation." (*Id.*) Plaintiff was able to recall words and digits, but not all of them. (*Id.*) In addition, he could spell his first name, but not the word "Mundo." (*Id.*) He could also perform simple arithmetic, but he was unable "to

9

subtract 10-3." (*Id.*)  Plaintiff's "judgment appeared good" and his "insight was fair."  (Tr. 730-31.)

Dr. Tovar offered the following opinion regarding Plaintiff's mental capacity to perform work related functions:[7]

> [Plaintiff] can understand, remember and apply information.  He has the abilities to learn, recall and use information to perform work activities.  He can follow one—two steps instructions to carry out a task.  He has the ability to make work related decisions.  He cannot focus his attention on work activities at an appropriate and consistent pace.  He is unable to relate to and work with supervisors and co-workers.  [Plaintiff's] mental disorder would prevent him from regulating his emotions, but not controlling his behavior or maintaining his well-being in a work setting.
>
> [Plaintiff] did not report a mental disorder that has persisted over at least two years despite medical treatment and minimal capacity to adapt to changes or demands in his daily life.

(Tr. 731.)  Ultimately, Dr. Tovar diagnosed Plaintiff with "Other Specified Depressive Disorder: Recurrent Brief Depression."  (*Id.*)  According to Dr. Tovar, Plaintiff's prognosis is "guarded" but "[i]t is possible [that] his symptoms would decrease with appropriate interventions."  (*Id.*)

Beginning in December of 2020, the state agency medical experts, Dr. Virginia Bell-Pringle, Ph.D., and Dr. B. Rudnick, M.D., reviewed Plaintiff's medical records.  Drs. Bell-Pringle and Rudnick determined that Plaintiff had a "depressive disorder"; however, it was "non severe." (Tr. 95-97, 112-14, 133-35, 151-53.)  In addition, Drs. Bell-Pringle and Rudnick also determined that there was "insufficient evidence to substantiate the presence" of "anxiety and obsessive-compulsive disorders."  (Tr. 95-97, 112-14, 133-35, 151-53.)  As such, they determined that a mental RFC assessment of Plaintiff was unnecessary.

3.    Other Physical Ailments

---

[7] The ALJ provided a detailed summary of Dr. Tovar's opinion in her decision denying Plaintiff disability benefits, which the undersigned found helpful.  (Tr. 17.)

As noted, Plaintiff alleges that the physical ailments that prevent him from working include back problems, hypertension, high cholesterol, abdominal pain, and arthritis. (*See* Tr. 265, 275.) The medical evidence as it relates to these conditions will be briefly summarized as well.

Plaintiff appears to have been struggling with obesity for quite some time. (*See* Tr. 356 (in January 2015 obesity listed as "probable").) Beginning in 2016, Plaintiff has complained of pain/tinnitus of his left ear. (Tr. 392-95.) This persisted into 2017. (Tr. 396-99.) He also experienced a "moderate[ly]" painful earache in 2021. (Tr. 1139.) At that time his left ear was also ringing. (*Id.*)

He also experienced abdominal pain beginning in 2017. (Tr. 396-404.) His abdominal pain initially resolved quickly, but later returned. (Tr. 401, 406-08.) Apparently, this was due to an injury he suffered while showering. (Tr. 504, 630-33.) As such, he underwent an abdominal ultrasound, CT of his abdomen, and a sonograph of his groin. (Tr. 471-75, 506-08, 562, 564-66, 635, 1128-32.) The findings were largely unremarkable, but showed a "fatty infiltration of the liver," a "left inguinal hernia," diverticulitis, and fluid in his pelvis and scrotum. (*Id.*) Ultimately, on June 22, 2017, Plaintiff underwent surgery to repair his hernia, which was completed with no complications. (Tr. 543, 1026-28.)

The Donna Medical Clinic has treated Plaintiff for hypertension. (Tr. 409-17, 423-30, 448-51, 980-85, 990-96, 1071-87, 1105-08.) The "severity of [his] hypertension symptom[s]" range from mild to moderate. (Tr. 409, 414, 423, 443, 448.) In October 2019, Plaintiff complained of chest pain relating to his hypertension. (Tr. 443-47, 476-98, 1059-68, 1100-04.) As such, he underwent an X-ray and a CT angiograph of his chest. (Tr. 466-70, 496-98, 1123-27.) These diagnostic tests showed a "mildly enlarged" heart but were otherwise unremarkable. (*Id.*) Plaintiff continues to complain of "moderate" hypertension, as recently as March of 2021. (Tr. 880; *see*

11

*also* Tr. 965 (May of 2020); Tr. 969 (October of 2019).)  He stated that medication and rest relieve his hypertension symptoms.  (Tr. 880.)

In 2019, Plaintiff also complained of dizziness, insomnia, and numbness/tingling to his left arm.  (Tr. 431-42, 972-80, 1088-99.)  He described the severity of these conditions as mostly "moderate."  (*Id.*)  Plaintiff has experienced "moderate" dizziness as recently as March of 2021.  (Tr. 876; Tr. 959 (In May of 2020 Plaintiff reported moderate nausea associated with dizziness).)  He described it as "episodic," lasting two days, and being exacerbated by movement.  (Tr. 876.)  Although, his dizziness was relieved by rest.  (*Id.*)

In addition, Plaintiff has recently complained of neck pain and bilateral pain to his arms.  For example, in May of 2020, he stated he was experiencing "bilateral, upper arm(s), forearm(s), and hand(s)" pain that was both "dull" and "moderate."  (Tr. 962.)  According to Plaintiff, he had been experiencing this bilateral "upper extremity pain" for one month.  (*Id.*)  In addition, on December 4, 2020, Plaintiff complained of neck pain that was radiating to his left shoulder.  (Tr. 955-56.)  He described the pain as "aching" and "moderate," and he had been experiencing it for the last two days.  (Tr. 956.)

As to Plaintiff's alleged "back problems," the medical record sheds little light on this potential medical issue.  To begin with, in 2017 Plaintiff underwent a CT scan of his abdomen and pelvis due to experiencing "left lower quadrant pain."  (Tr. 471.)  The scan revealed a "grade 1 spondylolisthesis of L5 on S1 and multilevel degenerative change in the spine."[8]  (*Id.*)  On October 26, 2019—approximately two years later—Plaintiff had a CT angiograph of his chest due to experiencing chest pain.  (Tr. 466.)  The scan showed that his "vertebral body alignment" was

---

[8] Spondylolisthesis is the "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." STEDMAN'S MEDICAL DICTIONARY 1678 (27th ed. 2000). "Grade 1" of spondylolisthesis refers to the ***least*** severe case.

"within normal limits" and his "vertebral body heights" were "preserved." (Tr. 466-67.) In addition, at that time "mild degenerative changes [were] seen throughout the spine." (Tr. 467, 496.)

On May 18, 2020, Karina Trevino, PA, noted that Plaintiff had a "L spine surgery 5y ago." (Tr. 962.) However, there is nothing else in the medical record to support this. On June 28, 2021, Plaintiff presented to the Donna Medical Clinic complained of pain in his lower back. (Tr. 1139.) He described this pain as "moderate and [ ] constant." (*Id.*) However, upon review of his symptoms, the examiner noted "no back pain" in his musculoskeletal system. (*Id.*) Furthermore, a physical examination of his musculoskeletal system showed a "normal range of motion." (Tr. 1141.) Notwithstanding these findings, Plaintiff has repeatedly and routinely denied the presence of back pain when appearing for examination, including the following:

- No back pain (Tr. 353, 356, 359, 362, 365, 368, 372, 376, 382, 385, 389, 392, 396, 401, 409, 414, 423, 427, 431, 435, 439, 443, 448, 478, 942, 959, 1139);
- No neck pain (Tr. 372, 376, 382, 385, 389, 392, 396, 401, 409, 414, 423, 431, 435, 439, 443, 448, 942, 959, 1139); and
- Musculoskeletal "normal range of motion" (Tr. 354, 357, 360, 363, 368, 373, 393, 397, 402, 406, 411, 416, 419, 433, 440, 445, 478, 943, 1141).

**C.     The Evidentiary Hearing**

The ALJ held the evidentiary hearing on November 22, 2021.[9] (Tr. 31-58.) Two witnesses testified: Plaintiff and a vocational expert, William Elmore.[10]  Plaintiff was represented at the hearing by his attorney, Kenna R. Garner.[11]  He was 47 years old at the time of the hearing. (Tr. 36.) Plaintiff explained to the ALJ that "the highest level of education that [he] completed . . . was the seventh grade." (*Id.*) The ALJ briefly discussed with Plaintiff his work history, including his employment as a laborer for the City of Donna from 2014 to 2017. (*Id.*) Plaintiff described it as "hard labor," which including digging holes and filling potholes, and lifting objects weighing up to 80-pounds. (*Id.*) In 2013, Plaintiff worked with a family member "cutting grass [and] painting houses." (Tr. 37.)  He also worked as a provider for his disabled nephew, which included lifting and transferring him to the shower. (Tr. 37-38.)

Plaintiff's attorney, Ms. Garner, asked Plaintiff that since his alleged onset date of disability, "what has been the primary impairment or the worst thing going on with you"? (Tr. 38.) Plaintiff responded:

> The worst thing that's going on with me was my knee.  I have a problem with my first surgery.  And then, for the second surgery, the other problems, cannot bend it, cannot be walking or standing a lot or be on my knees.  I still have that problem. My pain don't go away, and I still have the falling.  And not only that – so I return to my other knee so it's getting harder.  And it's hard for me to walk on level – and it has to be on level ground, just holding with my knee braces, both of them, and it's hard to me.  And when I lean on my left side, it's another problem that I have there.

---

[9] "Due to the extraordinary circumstance presented by the COVID-19 pandemic," the hearing was conducted "over the phone." (Tr. 33.)  Plaintiff had no objection to the hearing being held telephonically. (*See* Tr. 33-34.)

[10] Mr. Elmore explained that he has "been a voc[ational] rehab counselor since 1983." (Tr. 56.)

[11] Although at the beginning of the hearing Plaintiff's attorney confirmed that the administrative record was complete, she noted that Plaintiff "would like to move to amend the alleged onset date to January 1st of 2020." (Tr. 34-35.)

(Tr. 38.) Plaintiff then clarified that "the main problem is the right knee." (*Id.*) Plaintiff explained that his surgeon told him he needs another surgery to place a "cadaver tendon" in his right knee. (Tr. 39.)

His family doctor has "prescribed . . . Tramadol, Meloxicam, and Gabapentin for [his] pains." (*Id.*) However, even with the medication, the pain in his right knee is a 9/10. (*Id.*) His right knee also "goes side to side," "pop[s] a lot," and feels like it is getter weaker. (Tr. 40.) Plaintiff explained that he also has a "hernia in the left side" that is affected when he favors his good knee. (*Id.*) He is unable to squat, climb stairs, or ladders. (Tr. 41.) Plaintiff is unstable when walking and uses a cane to ambulate, and sometimes his wife will assist him by holding him by his shoulder or back. (*Id.*)

As to his physical capabilities, Plaintiff stated that he can only stand and/or walk about 15 minutes before having to sit or take a break. (Tr. 41-43.) In total, Plaintiff estimates that he can stand for up to one hour during an eight-hour workday. (Tr. 42.) In fact, "most of the time" Plaintiff is in bed due to his knee because he "cannot stand it awake." (Tr. 44.) Plaintiff testified that sometimes he falls after losing his balance or his knee will give out on him. (Tr. 43.) In addition, changes in the weather increase the pain. (*Id.*)

Plaintiff is unable to "lift heavy stuff," and is limited to carrying "a half a gallon or gallon of milk." (Tr. 43.) He no longer prepares any meals. (Tr. 44.) Plaintiff does not do any household chores other than taking the trash out. (Tr. 44-45.) He is able to take care of his personal needs, like bathing and dressing. (Tr. 45.) He also drives himself to a nearby Wal-Mart to shop. (*Id.*)

Plaintiff testified that after undergoing surgery for his hernia he now has difficulty holding his urine and "cannot hold it too long." (Tr. 46.) Five to seven years ago Plaintiff developed tinnitus in his left ear. (Tr. 47.) Because of this, he "can barely hear on that side." (*Id.*)

15

Recently Plaintiff has been experiencing weakness in his left shoulder and hand.  (Tr. 47.)

He is unable to reach for objects using his left arm unless they are close by or not too high.  (Tr.

49.)  Plaintiff will use his cane to move objects within reach if they are too far, and despite his

hand weakness, he is capable of manipulating buttons and zippers.  (*Id.*)

At the hearing Plaintiff also described his mental health issues, albeit briefly.  (Tr. 50.)

According to him, he has been diagnosed with depression and anxiety.  (*Id.*)  He experiences mood

swings and crying spells.  (*Id.*)  Plaintiff had been taking medication to help but stopped because

"it was clashing with [his] other medication."  (*Id.*)  According to Plaintiff, his anxiety attacks have

increased in frequency over the past year.  (*Id.*)

The vocational expert, Mr. Elmore, testified next.[12]  (Tr. 50.)  He testified that Plaintiff's

prior work as a laborer and painter/landscaper would be considered at a heavy exertional level,

and his prior work as a home attendant would be considered at a medium exertional level generally,

and as performed by Plaintiff, heavy exertional level as well.  (Tr. 52-53.)  The ALJ asked the

following hypothetical:

> All right, Mr. Elmore, I'd like you to assume a hypothetical younger individual
> with a limited education and past work as you've described with a residual
> functional capacity to perform sedentary work, except that the individual can
> balance, stoop, and climb ramps occasionally, but never kneel, crouch, crawl, or
> climb stairs, ropes, ladders, or scaffolds.  The individual can perform tasks that
> never require exposure to hazards, such as machinery that requires agility to evade
> or to unprotected heights.  It does not appear that this individual could perform any
> of the claimant's past work.  Is that correct?

(Tr. 54.)  Mr. Elmore responded "[y]es, ma'am."  (*Id.*)  Mr. Elmore was asked "[i]s there other

work the individual could perform"?  (*Id.*)  The VE identified the following three jobs:

1)      Addresser: 10,000 jobs available nationally;

---

[12] Plaintiff's attorney did not have any objections to Mr. Elmore's qualifications.  (Tr. 50.)

2)      Document Preparer: 60,000 jobs available nationally; and

3)      Table Worker: 3,000 jobs available nationally.

(Tr. 54-55.)

For the second hypothetical, the ALJ asked Mr. Elmore to assume "the same individual as in hypothetical #1, but the individual does require the use of a cane to balance, stand, and walk, [and] would be holding that cane in the dominant upper extremity." (Tr. 55.) Mr. Elmore stated that "this individual [would] be able to perform the jobs [ ] just identified." (*Id.*) The ALJ's third hypothetical was "the same as the first, but the individual can stand and/or walk combined for 15 minutes at a time before requiring the opportunity to sit and would not need to cease work activity while doing so." (*Id.*) The VE confirmed that this "individual [would] be able to perform the jobs [he] just identified." (*Id.*)

Next, the ALJ imagined an individual with the same limitations as in the first hypothetical, except that the individual "required the opportunity to rest in a reclined position for up to two hours throughout the eight-hour workday." (*Id.*) The VE responded that the individual would not be able to maintain employment. (*Id.*) For "the fifth hypothetical, [the ALJ asked that if the individual in hypothetical #1 were to be absent from work on a recurring average of two days per month without advance notice to or approval from the employer, would that individual be able to maintain employment"? (Tr. 55-56.) Here again, the VE responded that this individual would not be able to maintain competitive employment. (Tr. 56.)

At the hearing Plaintiff's attorney asked the VE one question, which was the following:

Mr. Elmore, regarding hypothetical #1, please, if – the same hypothetical that was given, but if we further assume that this individual would be unable to relate to supervisors, co-workers, and also would not be able to focus his attention on work activities at an appropriate and consistent pace throughout the day, what effect, if any, would that have on the jobs that were mentioned?

17

(Tr. 56.)  The VE responded that "[i]t would preclude them and all others."  (*Id.*)  The ALJ then confirmed that the VE's testimony was "consistent with the DOT and the SCO," and that his expert opinion that was not based on the DOT or SCO was based upon his "[t]raining and experience." (*Id.*)

Plaintiff's attorney made a closing argument.  (Tr. 57.)  She argued that Plaintiff is being treated for "depressive symptoms," and when you combine that with his ability to stand and/or walk for only two hours out of an eight-hour day, "that it would preclude all work."  (*Id.*)  She also stressed the pain that Plaintiff experiences and that "he does need another surgery."  (*Id.*)

**D.     The ALJ's Decision**

The ALJ issued a thorough written decision, consisting of thirteen pages of single-spaced type.  (Tr. 12-24.)  In making her decision, the ALJ applied the five-step method for evaluating disability claims.[13]

The ALJ first found (at Step One) that Plaintiff had not performed substantial gainful activity since the alleged onset date of disability, January 1, 2020.  (Tr. 15.)  In considering the severity of Plaintiff's impairments (Step Two), the ALJ determined that Plaintiff had the following "severe" medical impairments: "right knee degenerative joint disease, hypertension, and obesity (20 CFR 404.1520(c) and 416.920(c))."  (*Id.*)  However, the ALJ determined that Plaintiff's "mental impairments of other specified depressive disorder with recurrent brief depression and opioid dependence" were "nonsevere" because they "do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities."[14]  (*Id.*)  In making these

---

[13] The five-step process for determining whether a plaintiff is eligible for benefits will be explained further in the Standard of Review section of this report, *infra* Part II.A.

[14] The ALJ also found that Plaintiff's "mixed hyperlipidemia, hypertriglyceridemia, fatty liver, tinnitus, and insomnia" were "nonsevere impairments" because they were "managed medically," not requiring "aggressive treatment," and "that they do not significantly limit [his]

determinations, the ALJ summarized the medical evidence of record (which was detailed, thorough, and exhaustive). (Tr. 15-22.)

The ALJ also found that Plaintiff's impairments were not severe enough, singly or collectively, to meet or medically equal one of the listed impairments in the regulations (Step Three). (Tr. 18.)  In reaching this conclusion, the ALJ analyzed listings addressing Plaintiff's various physical conditions. (*Id.*)  Specifically, the ALJ performed a detailed assessment of "listings 1.17 and 1.18" regarding Plaintiff's "right knee impairment," Social Security Ruling 19-2p regarding obesity, and "the listing in 4.00(H)(1)" regarding hypertension. (*Id.*)

The ALJ also determined that the severity of Plaintiff's mental impairments of "other specified depressive disorder with recurrent brief depression and opioid dependence, considered singly and in combination," did not meet or medically equal the criteria of listing 12.04 (which includes the "paragraph B" criteria). (Tr. 15-17.)  In making this finding, the ALJ determined that Plaintiff had only "mild limitation" in the following paragraph B criteria: 1) understanding, remembering, or applying information; 2) interacting with others; 3) concentrating, persisting, or maintaining pace; and 4) adapting or managing oneself. (Tr. 15-16.)  Accordingly, the ALJ did not find the "paragraph B" criteria satisfied. (*See* Tr. 15-17.)

The ALJ next assessed Plaintiff's residual functional capacity (RFC) to do physical and mental work activities.  The ALJ made the following RFC finding:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant can balance, stoop, and climb ramps occasionally, but never kneel, crouch, crawl, or climb stairs, ropes, ladders, or scaffolds.  He can perform tasks that never require exposure to hazards,

---

ability to perform basic work activities as required by SSR 85-28." (Tr. 15.)  In addition, the ALJ determined that Plaintiff's "alleged hernia/abdominal pain and left shoulder pain are not medically determinable impairments." (Tr. 17-18.)

such as machinery that requires agility to evade or to unprotected heights.  The
claimant requires the use of cane to balance, stand, and walk.

(Tr. 18-19.)  In making this finding, the ALJ "considered all symptoms and the extent to which
these symptoms can reasonably be accepted as consistent with the objective medical evidence and
other evidence."  (Tr. 19.)

In considering Plaintiff's symptoms, the ALJ followed the two-step process required by
the regulations.  First, she considered "whether there is an underlying medically determinable
physical or mental impairment(s) … that could reasonably be expected to produce the claimant's
pain or other symptoms."  (*Id.*)  In addressing this inquiry, the ALJ provided a detailed summary
of the medical evidence in the record.[15]  (Tr. 15-22.)  After assessing the evidence regarding
Plaintiff's impairments, the second step of the analysis required the ALJ to "evaluate the intensity,
persistence, and limiting effects of the claimant's symptoms to determine the extent to which they
limit the claimant's work-related activities."  (Tr. 19.)  In doing this, the ALJ also evaluated
Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [his]
symptoms."  (*See* Tr. 19-20.)

Ultimately, the ALJ found that Plaintiff suffered from numerous "medically determinable
impairments . . . however, the claimant's statements concerning the intensity, persistence and
limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other
evidence in the record."  (Tr. 20, 22 ("Regarding the alleged intensity, persistence, and limiting
effects of the claimant's impairments, the objective medical evidence and other evidence does not
support limitations beyond those assessed herein.").)  The ALJ explained that the medical evidence
"does not support" Plaintiff's "alleged significant exertional limitations," noting that his

---

[15] In addition, the ALJ summarized and considered Plaintiff's testimony at the evidentiary
hearing.  (Tr. 19.)

20

"treatment history shows that surgical intervention was largely successful in correcting the tears in his right knee." (Tr. 21-22.)

The ALJ also considered the medical opinion evidence. (Tr. 22.) In doing this, the ALJ noted that she "cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources."[16] (*Id.*) The ALJ began by evaluating the opinions of Leigh McCary, M.D., and Yondell Moore, M.D., the two state agency medical consultants (SAMC). (*Id.*) She found that Drs. McCary and Moore's opinions regarding Plaintiff's RFC were "well supported by the cited physical examination findings, which show normal range of motion and abnormal gait," and therefore, their opinions were "persuasive." (*Id.*) "However, based on [Plaintiff's] history of surgical intervention the [ALJ] assessed greater exertional and postural limitations herein." (*Id.*)

As to the opinions of Virginia Bell-Pringle, Ph.D., and B. Rudnick, M.D., the two state agency psychological/psychiatric consultants, the ALJ found their determination that Plaintiff's "medically determinable psychiatric impairments were nonsevere" were "particularly persuasive." (Tr. 16-17.) Specifically, the ALJ found that "Dr. Bell-Pringle and Dr. Rudnick's "statements are well supported by the cited mental status observations, which show cooperative behavior, positive attitude, good rapport, normal thought process/content, normal perception, and average intelligence." (Tr. 17.) Furthermore, the ALJ found Drs. Bell-Pringle and Rudnick's "statements are consistent with [Plaintiff's] brief psychiatric treatment history, which shows cooperative behavior and appropriate mood/affect." (*Id.*)

---

[16] The ALJ also noted that she "has fully considered the medical opinions and prior administrative medical findings" in the record. (Tr. 22.)

In addition, the ALJ considered the opinion of Mario Tovar, Ph.D., the psychological consultative examiner.  (*Id.*)  To begin with, the ALJ determined that Dr. Tovar's opinions regarding Plaintiff's "abilities to understand, remember, and apply information, learn, recall, and use information, follow instructions, make decisions, control his behavior, and maintain his well-being are well-supported by his own mental status observations" and "consistent with [Plaintiff's] limited psychiatric treatment history."  (*Id.*)  However, as to Dr. Tovar's opinions regarding Plaintiff's "abilities to focus his attention, relate to and work with supervisors and coworkers, and regulate his emotions are poorly supported by his own mental status observations," and "inconsistent with [his] limited psychiatric treatment."  (*Id.*)

Next, the ALJ found that Plaintiff "is unable to perform any past relevant work" (Step Four).  (Tr. 23.)  In considering whether Plaintiff could perform any other jobs in the national economy (Step Five), the ALJ relied on the testimony of the vocational expert, Mr. Elmore.  In particular, Mr. Elmore opined that given the ALJ's RFC finding, Plaintiff could perform several other jobs, including an addresser, document preparer, and table worker.  (Tr. 24.)  From this, the ALJ concluded that Plaintiff is not disabled.

E.     **Procedural History**

Plaintiff sought administrative review of the ALJ's decision.  The Appeals Council concluded that there was no basis for challenging the decision, rendering it the Commissioner's final decision for purposes of judicial review.  The instant action followed in which Plaintiff seeks review of the decision pursuant to 42 U.S.C. § 405(g).  (Docket No. 1.)  Pending are the parties cross-motions for summary judgment.  (Docket Nos. 12-13.)  The issues have been briefed by the parties and will be analyzed in light of the applicable standard of review.

## II.  ANALYSIS

A.    **Standard of Review**

To qualify for benefits under the Social Security Act (the "Act"), Plaintiff bears the burden of proving that she is disabled. 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); *see also Fraga v. Bowen*, 810 F.3d 1296, 1301 (5th Cir. 1987) (citing *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983)). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at §§ 423(d)(3), 1382c(a)(3)(D).

To determine whether a claimant is disabled within the meaning of the Act, the Commissioner applies the following five-step inquiry:

(1)    whether the claimant is currently working in substantial gainful employment;

(2)    whether the claimant suffers from a severe impairment;

(3)    whether the claimant's severe impairment is sufficient under the pertinent regulations to support a finding of disability;

(4)    whether the claimant is capable of returning to his or her past relevant work; and, if not,

(5)    whether the impairment prevents the claimant from performing certain other types of employment.

*See* 20 C.F.R. §§ 404.1520, 416.920.

A finding that a claimant is disabled or not disabled at any point in the five-step inquiry is conclusive and terminates the analysis. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). At Steps One through Four, the burden of proof rests upon the claimant to show that she is disabled. If the claimant satisfies this responsibility, the burden then shifts to the Commissioner at Step Five of the process to show that there is other gainful employment that the claimant is capable of performing despite her existing impairments. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). Although the burden is initially on the Commissioner at Step Five, once the Commissioner makes a showing that the claimant can perform other work, the burden shifts back to the claimant to rebut the finding that there are jobs that exist in significant numbers that the claimant could perform. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "Throughout the process, the ultimate burden of establishing disability remains with the claimant." *Strempel v. Astrue*, 299 F. App'x 434, 437 (5th Cir. 2008) (citing *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983)).

In this case, the ALJ found at Step Four that Plaintiff was unable to perform his past relevant work. At Step Five, the ALJ found, based on the vocational expert's testimony, that Plaintiff was not disabled because he could perform jobs existing in significant numbers in the national economy. In light of this evidence that Plaintiff could perform other work, the ultimate burden of proof remained with the Plaintiff.

A federal court's review of the Commissioner's final decision is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Masterson*, 309 F.3d at 272. Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no

credible evidentiary choices or medical findings support the decision. *Id.* Evidentiary conflicts are for the Commissioner to resolve, not the courts. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). This Court may neither reweigh the evidence in the record, nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if substantial evidence is present. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988). In applying this deferential standard, however, the Court is not a "rubber stamp" for the Commissioner's decision, particularly given the importance of the benefits in question. *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985); *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 500 (S.D. Tex. 2003).

**B.     Issues**

In seeking review of the Commissioner's denial of benefits, Plaintiff alleges that the ALJ committed reversible error in three claims: 1) by failing "to apply the correct legal standard for the severity of Plaintiff's impairments"; 2) because the "ALJ's residual functional capacity finding is not supported by substantial evidence"; and 3) by failing to resolve conflicts in the vocational expert's testimony. (Docket No. 12, at 5, 9, 12.) The Commissioner argues that the ALJ did not commit reversible error because she "carefully reviewed the record, delineate[d] [her] findings with attention to the full record, and point[ed] to substantial evidentiary support for [her] findings." (Docket No. 13-1, at 2.) Plaintiff filed a reply to the Commissioner. (Docket No. 14.)

**C.     Step Two Error**

Plaintiff's first claim is that the ALJ erred at Step Two when she failed to properly consider all of Plaintiff's vocationally significant impairments. (Docket No. 12, at 5-8.) Specifically, Plaintiff claims that the ALJ "use[d] the wrong definition of severity" and that this error caused her to provide "an inadequate rationale for symptom evaluation" at Step Two regarding the "combined effects of all [Plaintiff's] impairments." (*Id.*) The Commissioner argues that Plaintiff's

claim alleging error at Step Two should be rejected because she has not shown reversible error, and even if she had, any such error would be harmless. (Docket No. 13-1, at 4-13.) The Commissioner is correct.

A severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104–05 (5th Cir. 1985) (citing *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir. 1984)). In making a severity determination, the ALJ must set forth the correct standard by reference to Fifth Circuit opinions or by an express statement that the Fifth Circuit's construction of the regulation has been applied. *See Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986).

Here, the ALJ did not refer to *Stone v. Heckler* in her written decision, nor did she quote the language from the opinion describing what a non-severe impairment is. (*See* Tr. 13-18.) Rather, she cited to the regulations and Social Security Rulings to describe a non-severe impairment as follows: "An impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1522 and 416.922; Social Security Rulings (SSRs) 85-28 and 16-3p)."[17] (Tr. 13-14.)

---

[17] The purpose of SSR 85-28 was to "clarify the policy for determining when a person's impairment(s) may be found 'not severe' and, thus, the basis for a finding of 'not disabled' in the sequential evaluation of disability." SSR 85-28, 1985 WL 56856 (Jan. 1, 1985). In fact, the Social Security Administration also noted that SSR 85-28 was "being issued to clarify that SSA's policy is consistent with various [recent] court decision," such as *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). *Id.* at *2.

In addition to finding Plaintiff's that right knee degenerative joint disease, hypertension, and obesity were "severe impairments," the ALJ also determined that her "mixed hyperlipidemia, hypertriglyceridemia, fatty liver, tinnitus, and insomnia" were "nonsevere impairments." (Tr. 15.) The ALJ reasoned that the medical evidence showed that these conditions were "managed medically and should be amenable to proper control by adherence to recommended medical management," and that "no aggressive treatment was recommended or anticipated" for them. (*Id.*) Accordingly, the ALJ stated "that they do not significantly limit [Plaintiff's] ability to perform basic work activities as required by SSR 85-28." (*Id.*) Plaintiff does not challenge those findings here.[18]

Similarly, the ALJ determined that Plaintiff's "mental impairments of other specified depressive disorder with recurrent brief depression and opioid dependence" were nonsevere because the medical evidence shows that they "do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." (*Id.*) Although Plaintiff and the Commissioner agree that the ALJ's statement of the standard differs from that as articulated in *Stone v. Heckler*, the ALJ's written decision shows that she understood the correct legal standard in considering (at Step Two of the disability analysis) whether Plaintiff's various physical and mental conditions were severe impairments.

Specifically, the ALJ reviewed the medical evidence associated with Plaintiff's mental impairments, and explained—in great detail—how Plaintiff only exhibits a "mild limitation" in the following "four broad functional areas:" 1) understanding, remembering, or applying information; 2) interacting with others; 3) concentrating, persisting, or maintaining pace; and 4)

---

[18] The ALJ also determined that Plaintiff's "alleged hernia/abdominal pain and left shoulder pain are not medically determinable impairments." (Tr. 17-18.) Plaintiff likewise does not challenge this finding.

adapting or managing oneself." (Tr. 15-16.)  In addition, the ALJ reviewed Drs. Bell-Pringle and Rudnick's—the state agency psychological/psychiatric consultants—opinions regarding the "nonsevere" nature of Plaintiff's "medically determinable psychiatric impairments." (Tr. 16.)  She found them "particularly persuasive" because they were "well supported by the cited mental status observations" and "consistent with [Plaintiff's] brief psychiatric treatment history." (Tr. 16-17.)

Next, the ALJ reviewed Dr. Tovar's—the psychological consultative examiner—opinion and as to Plaintiff's "abilities to understand, remember, and apply information, learn, recall, and use information, follow instructions, make decisions, control his behavior, and maintain his well-being. (Tr. 17.)  She found the opinion persuasive because it was well-supported by the medical evidence and consistent with Plaintiff's limited psychiatric treatment history.  (*Id.*)  Notably, the opinion was supported by Dr. Tovar's "own mental status observations," which included Plaintiff's "cooperative behavior, positive attitude, good rapport, normal thought process/content, normal perception, and average intelligence."  (*Id.* (citing Tr. 728-30).)  Plaintiff also routinely displayed "appropriate mood/affect."  (Tr. 17 (*see supra* Part I.B.2.).)

On the other hand, as to Plaintiff's "abilities to focus his attention, relate to and work with supervisors and coworkers, and regulate his emotions," the ALJ found Dr. Tovar's opinions poorly supported and inconsistent with the medical record.  Here again, these included Dr. Tovar's "own mental status observations."  (*Id.*)  Thus, the ALJ found that portion of Dr. Tovar's opinion unpersuasive.  (*Id.*)

As such, the ALJ concluded that Plaintiff's "medically determinable mental impairments—[considered singly and in combination]—cause no more than a 'mild' limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal limitation in [his] ability to do basic [mental] work activities." (Tr 15-16 (emphasis in original).)

Consistent with these findings, the ALJ concluded that Plaintiff's "other specified depressive disorder with recurrent brief depression and opioid dependence" are "nonsevere" impairments. (*Id.*)

The ALJ's finding is supported by substantial evidence, as reflected by her detailed written reasons in support of the conclusion that Plaintiff could perform sedentary work, without any mental health restrictions. (Tr. 15-23.) To begin with, Plaintiff "has no history of specialized psychiatric treatment" and he "did not report a mental disorder that has persisted over at least two years." (Tr. 15, 17.) In addition, Plaintiff "exhibited normal thought process," is oriented times four, cooperative, and is able to take care of his grandchildren. (Tr. 15-16.) Furthermore, he is able to concentrate and complete tasks, adapt to "changes in routine fairly," and perform basis activities of daily living without assistance. (Tr. 16.)

In any event, even if the ALJ had erred in failing to specifically apply the *Stone* standard, any such error would have been harmless. The Fifth Circuit does not require "procedural perfection ... unless it affects the substantial rights of a party." *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012). Here, the ALJ did not end her analysis with a disability finding at Step Two, but rather she considered all of Plaintiff's alleged impairments and symptoms in determining at Step Four that Plaintiff retained the ability to perform a restricted range of sedentary work. (Tr. 15-23.) It is well settled in the Fifth Circuit that reversal is not required if the ALJ does not terminate the case at step two of the sequential analysis. *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) ("any error by the ALJ in not following the procedures set out in Stone is harmless" when the ALJ proceeds past step two in the analysis to find that Plaintiff is not disabled).[19]

_____

[19] *See also Adams v. Bowen,* 833 F.2d 509, 512 (5th Cir. 1987) (finding that appellant's argument that the ALJ erred in failing to find her back problems severe was not grounds for a remand because the case did not implicate the "non-severity" of plaintiff's condition since

Next, Plaintiff takes issue with the ALJ's failure to address his alleged impairments of anxiety and an "impairment of the spine." (Docket No. 12, at 7; Docket No. 14, at 4.) To be sure, in his disability application Plaintiff listed "back problems" and anxiety as conditions that prevented him from working. (*See* Tr. 265, 275.) Then, at the evidentiary hearing, Plaintiff did not mention having any "back problems." (*See* Tr. 31-58.) On the other hand, Plaintiff has described his anxiety as worsening over the past year. (Tr. 50 (Plaintiff's "anxiety attacks" have occurred "more in the last year.").) Nevertheless, the medical evidence in the record addressing these two conditions is, at best, scant.

For example, on June 19, 2015, Plaintiff stated that due to the injury he sustained to his right knee he was experiencing both depression and anxiety. (Tr. 869.) On October 26, 2019—over four years later—while being evaluated for chest pain Plaintiff "denie[d] anxiety" currently stated that he had experienced it in the past. (Tr. 476.) The next year, in May 2020, Plaintiff was experiencing a "nervous anxious nauseous feeling in his stomach," but he "refused [a] psychology referral." (*See* Tr. 961.)

In fact, the medical evidence of record overwhelmingly reflects that Plaintiff lacks symptoms of anxiety[20] and upon examination he routinely displays appropriate mood and affect.[21] Not surprisingly, Drs. Bell-Pringle and Rudnick, the state agency medical consultants, did not find

---

the ALJ continued through step four of the sequential analysis); *Jones v. Bowen,* 829 F.2d 524, 527 n.1 (5th Cir. 1987) (no *Stone* error where ALJ properly found that the claimant's hypertension was mild and proceeded through step five, rather than denying benefits "prematurely ... based on an improper determination of 'non-severity'"); *Herrera v. Astrue*, 406 F. App'x 899, 903 (5th Cir. Dec. 30, 2010) (same).

[20] (Tr. 353, 356, 359, 362, 365, 368, 372, 376, 382, 385, 389, 392, 396, 401, 409, 414, 418, 423, 427, 431, 439, 443, 448, 476, 876, 880, 942, 956, 966, 1139.)

[21] (Tr. 354, 357, 360, 363, 373, 377, 383, 386, 390, 393, 397, 402, 407, 411, 416, 420, 425, 429, 433, 436, 441, 445, 478, 878, 882, 943, 957, 961, 964, 1141.)

enough evidence in the record to establish anxiety as a medically recognizable impairment.  (Tr. 95-97, 112-14, 133-35, 151-53 ("insufficient evidence to substantiate the presence" of "anxiety and obsessive-compulsive disorders").)  In reviewing the medical evidence, the ALJ made clear that: "Disability is not based on alleged symptoms alone.  Impairments must be established by objective medical evidence."  (Tr. 18 (citing SSR 16-3p, 20 CFR 404.1521 and 416.921).) Furthermore, the burden to establish a disability is squarely on Plaintiff.  *Strempel*, 299 F. App'x at 437 ("Throughout the process, the ultimate burden of establishing disability remains with the claimant.").

As to Plaintiff's alleged "back problems," here again, the medical evidence of record addressing Plaintiff's back is scant.  To begin with, in 2017 a CT scan of Plaintiff's abdomen and pelvis revealed *minor* "spondylolisthesis of L5 on S1 and multilevel degenerative change in the spine." (Tr. 471.)  In 2019—approximately two years later—a CT angiograph of Plaintiff's chest showed that his "vertebral body alignment" was "*within normal limits*" and his "vertebral body heights" were "*preserved*." (Tr. 466-67 (emphasis added).)  In addition, at that time "*mild* degenerative changes [were] seen throughout the spine."[22]  (Tr. 467, 496 (emphasis added).)

On June 28, 2021, Plaintiff presented to the Donna Medical Clinic where he described experiencing pain in his lower back that was "moderate and [ ] constant." (Tr. 1139.)  However, upon review of his symptoms, the examiner noted "no back pain" in his musculoskeletal system. (*Id.*)  Furthermore, a physical examination of his musculoskeletal system showed a "normal range of motion."  (Tr. 1141.)  Notwithstanding these findings, Plaintiff has repeatedly and routinely

---

[22] On May 18, 2020, Karina Trevino, PA, noted that Plaintiff had a "L spine surgery 5y ago." (Tr. 962.)  However, there is nothing else in the medical record to support this.

denied the presence of back pain when appearing for examination.[23]  Furthermore, upon physical

examination Plaintiff's musculoskeletal system has shown a "normal range of motion."[24]

Plaintiff takes issue with the ALJ's analysis—or lack thereof—of his alleged back

problems.  According to him, "[i]n this case, the ALJ did not consider all of [his] impairments";

specifically, "[t]here is no discussion or even mention of the Plaintiff's impairment of the spine."

(Docket No. 14, at 4.)  However, there is no question that the ALJ was aware of the medical

evidence in the record relating to Plaintiff's spine.

To begin with, as noted, Plaintiff did not testify that he was experiencing any symptoms

related to his back at the evidentiary hearing.  (*See* Tr. 31-58.)  The ALJ provided a detailed

summary of Plaintiff's testimony at the hearing.  (Tr. 19.)  The ALJ also summarized the medical

evidence in the record regarding Plaintiff's upper torso; including his "alleged hernia/abdominal

pain." (Tr. 17.)  More importantly, the ALJ stressed that "the objective medical evidence . . . does

not support . . . the alleged intensity, persistence, and limiting effects" of Plaintiff's impairments.

(Tr. 22.)  In making this finding, the ALJ noted that Plaintiff has a normal gait and "physical

examinations often note a normal range of motion" and a normal motor function.  (*Id.*)  The ALJ

also made clear that she "did not provide articulation about the evidence that is inherently neither

valuable nor persuasive to the issue of whether [Plaintiff] is disabled."  (Tr. 22.)

Although Drs. McCary and Yondell noted that Plaintiff had a "spine disorder" that was

"severe," the ALJ undoubtedly disagreed with that determination.  (*See* Tr. 95, 112, 133, 151.)

Given the benign diagnostic findings relating to Plaintiff's back, and the positive objective medical

---

[23] (Tr. 353, 356, 359, 362, 365, 368, 372, 376, 382, 385, 389, 392, 396, 401, 409, 414, 423, 427, 431, 435, 439, 443, 448, 478, 942, 959, 1139.)

[24] (Tr. 354, 357, 360, 363, 368, 373, 393, 397, 402, 406, 411, 416, 419, 433, 440, 445, 478, 943, 1141.)

findings upon examination, the ALJ was free to reject that opinion. Here again, [i]mpairments must be established by objective medical evidence." (Tr. 18.) Stated another way, Plaintiff failed to establish a disability relating to his spine. *See Strempel*, 299 F. App'x at 437 ("Throughout the process, the ultimate burden of establishing disability remains with the claimant.").

In sum, even if the ALJ misstated the correct standard at step two of the disability analysis, there is no merit to Plaintiff's claim that the ALJ should have found that his anxiety and "back problems" were "severe" conditions. Moreover, even if the ALJ had erred on that issue, any such error was harmless because the ALJ's Step Four analysis is supported by substantial evidence.

## D.    The ALJ's RFC Determination

Next, Plaintiff claims that the ALJ committed reversible error because her "residual functional capacity finding is not supported by substantial evidence." (Docket No. 12, at 9-12; Docket No. 14, at 5-7.) Specifically, Plaintiff alleges that the ALJ committed reversible error by failing to properly consider Plaintiff's allegations regarding her depression and anxiety. (Docket No. 12, 9-12.) To the contrary, the Commissioner argues that the ALJ's RFC determination is properly supported by "all the relevant evidence, including the objective medical evidence, medical opinions, and Plaintiff's testimony." (Docket No. 13-1, at 13-17.)

"[F]ederal regulations require ALJs to assign each medical opinion a weight and explain the reasons for that weight." *Winston v. Berryhill*, 755 F. App'x 395, 402 (5th Cir. 2018). "After [Plaintiff's] claim was filed, the Social Security Administration changed its regulations so that ALJs are no longer required to assign each medical opinion a weight: 'For claims filed on or after March 27, 2017 ... [w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)....'" 20 C.F.R. § 404.1520c(a). *Winston*, 755 F.

App'x at 402 n.4.  One court has explained how the new regulations apply to medical opinions as

follows:

> Since [Plaintiff] filed for SSI and DIB "on or after March 27, 2017," the ALJ was
> required to apply the new regulations. 20 C.F.R. § 404.1520c. Through
> the new regulations, the Administration revised the procedures and standards
> for evaluating medical opinions and prior administrative medical findings,
> abrogating the treating physician rule. *See* Revisions to Rules Regarding
> the Evaluation of Medical Evidence ("Revisions to Rules"), 82 Fed. Reg. 5844
> (Jan. 18, 2017); 20 C.F.R. § 416.920c(a). As such, ALJs are "no longer required to
> give controlling weight" to the opinions of treating physicians. *See, e.g., Pearson
> v. Commissioner*, No. 20–CV–3030 (AMD), 2021 WL 3373132, at *4–*5
> (E.D.N.Y. Aug. 3, 2021). Instead, the ALJ considers the persuasiveness
> of medical opinions from different medical sources. 20 C.F.R. § 404.1520c(b)(2).
> In evaluating persuasiveness, the ALJ considers five factors: (i) supportability; (ii)
> consistency; (iii) the source's relationship with the patient; (iv) the source's
> specialty; and (v) "other factors that tend to support or contradict" the opinion. 20
> C.F.R. § 404.1520c(c). The most important factors in evaluating persuasiveness are
> supportability and consistency. 20 C.F.R. § 404.1520c(b)(2).  In considering these
> factors, the ALJ is required to "*explain how* [h]e considered the supportability and
> consistency factors for a medical source's medical opinions or prior administrative
> medical findings in [Plaintiff's] determination or decision." *Id.* (emphasis added).
>
> With respect to "supportability," "the strength of a medical opinion increases as the
> relevance of the objective medical evidence and explanations presented by the
> medical source increase." *Vellone v. Saul*, 1:20–CV–00261–RAK–HP, 2021 WL
> 319354, at *6 (S.D.N.Y. Jan. 29, 2021) (citing 20 C.F.R. §§ 404.1520c(c)(1)). *See
> also* Revision to Rules, 82 Fed. Reg. at 5853. The regulations provide that
> "consistency" is "an all-encompassing inquiry focused on how well a medical
> source is supported, or not supported, by the entire record." *Id.* (citing 20 C.F.R. §§
> 404.1520c(c)(2)). *See also* Revision to Rules, 82 Fed. Reg. at 5853.
>
> Considering the newness of the regulations, there is a dearth of caselaw concerning
> what constitutes a sufficient "explanation" of supportability and consistency under
> 20 C.F.R. § 404.1520c(b)(2). *See, e.g., Moore v. Saul*, No. 3:20–CV–48–DPJ–
> MTP, 2021 WL 754833, at *3 n.1 (S.D. Miss. Feb. 26, 2021). Nevertheless, the
> Administration's explanation of the new regulation sheds some light the issue.
> According to the Administration, it eschewed the treating physician rule because
> "the healthcare delivery system has changed in significant ways" since 1991 (when
> the treating physician rule was implemented) insofar as "[m]any individuals receive
> health care from multiple medical sources, such as from coordinated and managed
> care organizations, instead of from one treating [physician]." Revision to Rules, 82
> Fed. Reg. at 5853. Stated differently, individuals "less frequently develop a
> sustained relationship with one treating physician" today. *Ibid.* As such, the
> Administration has found that "the two most important factors for determining the

persuasiveness of medical opinions are consistency and supportability" and focusing analysis of those factors "help[s] eliminate confusion about a hierarchy of medical sources and instead focus[es] adjudication more on the persuasiveness of the content of the evidence." *Ibid.*

By contrast, under the old regulations, a treating physician's opinion was given controlling weight and could only be rejected "if the ALJ performs a *detailed analysis* of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Newton v. Apfel*, 209 F.3d 448, 454 (5th Cir. 2000) (emphasis added). An ALJ's insufficient explanation for departing from that medical opinion was grounds for reversal.
*Ibid.* While the new regulations eschewed "hierarchies of medical sources" and are not meant to "make evaluating evidence more difficult," Revision to Rules, 82 Fed. Reg. at 5853, it is clear that an ALJ's sufficient explanation of the supportability and consistency of medical opinions is still a critical portion of the analysis. To be sure, the ALJ is no longer required to undertake a similarly detailed analysis in rejecting a treating physician's medical opinion as persuasive. Cf. *Newton*, 209 F.3d at 454. Therefore, adequate discussion of medical opinion persuasiveness is important.

Likewise, other courts to address the issue have come to a similar conclusion, but they have been divergent about how exactly to measure the sufficiency of an ALJ's explanation when there is at least some mention of medical opinion persuasiveness. *Compare Harris v. Saul*, No. 19–CV–03715–NRN, 2021 WL 406080, at *2 (D. Colo. Feb. 5, 2021), *with Todd v. Comm'r of Soc. Sec.*, No. 3:20–CV–1374, 2021 WL 2535580, at *9 (N.D. Ohio June 3, 2021), *report and recommendation adopted*, No. 3:20–CV–1374, 2021 WL 2530846 (N.D. Ohio June 21, 2021). Most courts to address the issue appear to require the ALJ to provide a sufficient explanation of consistency and supportability to allow the court to undertake a meaningful review of whether his reasoning was supported by substantial evidence, *see, e.g., Ramirez v. Saul*, No. SA–20–CV–00457–ESC, 2021 WL 2269473, at *6 (W.D. Tex. June 3, 2021); *Todd*, 2021 WL 2535580, at *9; *Burba v. Comm'r of Soc. Sec.*, No. 1:19–CV–905, 2020 WL 5792621 (N.D. Ohio Sept. 29, 2020), and do not leave the Court to merely speculate about reasons behind the ALJ's persuasiveness finding or lack thereof, *see, e.g., Moore*, 2021 WL 754833, at *3; *Ramirez*, 2021 WL 2269473, at *6. Stated differently, there must be a discernible "logic bridge" between the evidence and the ALJ's persuasiveness finding. *Ramirez*, 2021 WL 2269473, at *6. Therefore, while the length of explanation need not be profound, *see, e.g., Vaughn v. Comm'r of Soc. Sec.*, No. 20–CV–1119–TMP, 2021 WL 3056108, at *9 (W.D. Tenn. July 20, 2021) (finding detailed three sentence explanation sufficient to be considered an explanation),[4] the ALJ must do more than pay lip service to the regulation without *substantively* engaging with the supportability and consistency of medical opinions in any detail whatsoever, *see, e.g., Howard D. v. Saul*, No. 5:19–CV–01615 (BKS), 2021 WL 1152834, at *12 (N.D.N.Y. Mar. 26, 2021). In other words, the ALJ cannot summarize the entire record and summarily conclude

35

> that, in light of that record, one medical opinion is persuasive and the other is not persuasive. *Raymond M. v. Comm'r of Soc. Sec.*, No. 5:19–CV–1313 (ATB), 2021 WL 706645, at *10 (N.D.N.Y. Feb. 22, 2021).

*Pearson v. Comm'r of Soc. Sec.*, 20-cv-166, 2021 WL 3708047, at *4–5 (S.D. Miss. Aug. 11, 2021), *report and recommendation adopted*, 2021 WL 3663073 (S.D. Miss. Aug. 18, 2021).

To begin with, the ALJ summarized—in great detail—the relevant medical evidence in the record pertaining to Plaintiff's alleged physical and mental impairments. (Tr. 15-23.) The ALJ also acknowledged the relevant medical source opinions in the record. (*Id.*) Specifically, in her opinion she addressed the medical opinions of the following: 1) Drs. McCary and Moore, the state agency medical consultants; 2) Drs. Bell-Pringle and Rudnick, the state agency psychological consultants; 3) Dr. Tovar, the consultative examiner; and 4) Ms. Trevino, Plaintiff's treating physician's assistant at the Donna Medical Clinic. (*Id.*) In addition, the ALJ "considered [the] medical opinions under the Agency's current rules for evidence evaluation (20 CFR 404.1520c and 416.920c)," including the persuasiveness and consistency of the opinions. (Tr. 16); *see also Pearson*, 2021 WL 3708047, at *4 (citing 20 C.F.R. § 404.1520c(b)(2)).

In fact, as to the medical opinions of Drs. Bell-Pringle and Rudnick, the state agency psychological consultants, the ALJ "highlighted" their opinions because they were "particularly persuasive in determining the severity of [Plaintiff's] mental impairments." (Tr. 16.) Both Drs. Bell-Pringle and Rudnick determined that Plaintiff's depression was non-severe and that he did not have a medically determinable anxiety disorder. (Tr. 95-97, 112-14, 133-35, 151-53.) As such, Drs. Bell-Pringle and Rudnick determined that a mental RFC assessment of Plaintiff was unnecessary. The ALJ found this conclusion "well supported by the cited mental status observations, which show cooperative behavior, positive attitude, good rapport, normal thought process/content, normal perception, and average intelligence." (Tr. 17.) In addition, the ALJ

determined that Drs. Bell-Pringle and Rudnick's assessment was "consistent with [Plaintiff's] brief psychiatric treatment history, which shows cooperative behavior and appropriate mood/affect." (*Id.*)

As to Dr. Tovar's medical opinion, the ALJ found it to be a bit of a mixed bag, as she found it partially persuasive and partially unpersuasive. (Tr. 17.) To begin with, the ALJ determined that Dr. Tovar's opinions regarding Plaintiff's "abilities to understand, remember, and apply information, learn, recall, and use information, follow instructions, make decisions, control his behavior, and maintain his well-being are *well-supported* by his own mental status observations" and "*consistent* with [Plaintiff's] limited psychiatric treatment history." (*Id.* (emphasis added).) As such, the ALJ stated that this portion of Dr. Tovar's medical opinion was "persuasive." (*Id.*)

On the other hand, as to Dr. Tovar's opinions regarding Plaintiff's "abilities to focus his attention, relate to and work with supervisors and coworkers, and regulate his emotions," the ALJ found them "*poorly supported* by [Dr. Tovar's] own mental status observations," which showed Plaintiff's "cooperative behavior, positive attitude, good rapport, normal thought process/content, normal perception, and average intelligence." (*Id.* (emphasis added).) In addition, the ALJ found this portion of the opinion "*inconsistent* with [Plaintiff's] limited psychiatric treatment," which showed that Plaintiff displayed "cooperative behavior and appropriate mood/affect." (*Id.* (emphasis added).) As such, the ALJ stated that this portion of Dr. Tovar's medical opinion was "unpersuasive."[25] (*Id.*)

---

[25] Ultimately, the ALJ's assessment and treatment of the medical opinions of Drs. Bell-Pringle, Rudnick, and Tovar, as well as the medical evidence, resulted in the ALJ assessing Plaintiff's mental capacity to perform work-related functions of the RFC as unrestricted. (*See* Tr. 18-19.)

Here, the ALJ provided "a sufficient explanation of consistency and supportability to allow the court to undertake a meaningful review of whether his reasoning was supported by substantial evidence." *See Pearson*, 2021 WL 3708047, at *5. "Stated differently, there [is] a discernible 'logic bridge' between the evidence and the ALJ's persuasiveness finding." *See Pearson*, 2021 WL 3708047, at *5.

Although Plaintiff disagrees with the ALJ's RFC determination as it relates to his alleged mental impairments, the evidence of record shows that the RFC is supported by substantial evidence. Specifically, the medical evidence reflects that Plaintiff repeatedly denies and/or lacks symptoms of depression and anxiety.[26] In addition, upon examination Plaintiff regularly exhibits cooperative behavior,[27] appropriate mood and affect,[28] lack of confusion,[29] normal judgment,[30] and that he is alert and oriented.[31]

Plaintiff takes issue with the ALJ's conclusion that his depression and anxiety symptoms did not rise to the level that they affected his ability to perform work related functions at the sedentary level; and he specifically refers to medical visits that occurred in May and December of 2020. (Docket No. 12, at 10 (citing Tr. 956, 959, 961, 962).) To be sure, these visits reflect the presence of anxiety and/or depression. (*See* Tr. 956, 959 (mental health medications), 959

---

[26] (Tr. 353, 356, 359, 362, 365, 368, 372, 376, 382, 385, 389, 392, 396, 401, 409, 414, 418, 423, 427, 431, 439, 443, 448, 476, 876, 880, 942, 956, 966, 1139.)

[27] (Tr. 354, 357, 360, 363, 373, 377, 383, 386, 390, 393, 397, 402, 407, 411, 416, 420, 425, 429, 433, 436, 441, 445, 478, 878, 882, 943, 957, 961, 964, 1141.)

[28] (Tr. 354, 357, 360, 363, 373, 377, 383, 386, 390, 393, 397, 402, 407, 411, 416, 420, 425, 429, 433, 436, 441, 445, 478, 878, 882, 943, 957, 961, 964, 1141.)

[29] (Tr. 372, 376, 382, 385, 389, 392, 396, 401, 409, 414, 418, 423, 427, 431, 435, 439, 443, 448, 876, 880, 942, 956, 959, 963, 966, 1139.)

[30] (Tr. 354, 357, 360, 363, 478.)

[31] (Tr. 353, 356, 359, 362, 365, 368, 372, 376, 382, 385, 389, 392, 396, 401, 407, 409, 414, 418, 423, 427, 431, 435, 439, 443, 448, 478, 876, 880, 942, 956, 959, 963, 966, 1139.)

("nervous anxious nauseous feeling in stomach"), 961 (anxiety/depression), 962 (depression).)

However, these were not mental health medical visits.  (Tr. 956 (neck and shoulder pain), 959

(nausea/upper abdominal pain), 962 (upper extremity pain).)  Perhaps more importantly, upon

examination at these medical visits Plaintiff failed to exhibit mental health symptoms and/or

refused treatment.  (Tr. 956 (alert and oriented, no confusion, no anxiety, no depression), 959 (alert

and oriented, no confusion), 961 ("refused psychology referral"), 963 (alert and oriented, no

confusion), 964 (cooperative, appropriate mood and affect).)

For each of the medical opinions (including Dr. Tovar's), the ALJ explained how and/or

why they were supported and consistent with the record, or how and/or why they were not.[32]  (Tr.

16-17.)  "To be sure, the ALJ is no longer required to undertake a [ ] detailed analysis in rejecting

a treating physician's medical opinion as persuasive."  *Pearson*, 2021 WL 3708047, at *5.

Furthermore, "the length of explanation need not be profound."  *Id.*  In any event, the ALJ's

summary of the relevant medical evince and her explanation of her treatment of the medical source

opinions—including Dr. Tovar's—was not cursory, in fact, far from it.  Stated another way, the

ALJ's treatment of the persuasiveness—or lack thereof—of Dr. Tovar's medical opinion is

supported by substantial evidence.[33]

"The Commissioner, rather than the courts, must resolve conflicts in the evidence."[34]

*Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995).  In resolving the conflicts in the medical

---

[32] Furthermore, the ALJ is required to discuss the evidence but "is not always required to do an exhaustive point-by-point discussion." *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)).

[33] However, it bears repeating that the issue is not whether the Court would reach the same conclusion as did the ALJ. *Johnson*, 864 F.2d at 343 ("we may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute our judgment for that of the Secretary, even if the evidence preponderates against the Secretary's decision").

[34] Furthermore, "the ALJ has sole responsibility for determining a claimant's disability status," and "the ALJ is free to reject the opinion of *any* physician when the evidence supports a

evidence of record, the ALJ did "not leave the Court to merely speculate about reasons behind her persuasiveness finding or lack thereof." *Pearson*, 2021 WL 3708047, at *5. Rather, her reasoning provided a "'logic bridge' between the evidence and her persuasiveness finding" as to the medical opinions in the record. *Id.* More importantly, the ALJ's persuasiveness findings are supported by substantial evidence in the record, and Plaintiff's claim attacking the ALJ's RFC determination should be rejected.

## E.      Error Regarding the VE's Testimony

Plaintiff's final claim is that "[t]he ALJ committed reversible error by not resolving conflicts in the [Vocational Expert's] testimony." (Docket No. 12, at 12.) Specifically, Plaintiff argues "that the jobs cited by the VE do *not* exist in significant numbers in the national economy and that two of the three jobs are obsolete." (*Id.* at 13 (emphasis in original).) The Commissioner argues that Plaintiff "presented no evidence or argument that undermines the VE's testimony" that Plaintiff could perform the jobs that the VE listed. (Docket No. 13-1, at 17-21.) In addition, the Commissioner contends that the jobs are not obsolete, and that they do exist in significant numbers. (*Id.*)

In order for the ALJ to rule on Plaintiff's application for disability benefits at Step Five, she had to determine two issues. First, "[t]he ALJ needed to identify the types of jobs [Plaintiff] could perform notwithstanding his disabilities." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152–53 (2019) (citing 20 CFR §§ 404.1560(c)(1), 416.960(c)(1)). Second, "the ALJ needed to ascertain whether those kinds of jobs 'exist[ed] in significant numbers in the national economy.'" *Biestek*,

---

contrary conclusion." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)) (emphasis added). "[T]he ALJ 'is entitled to determine the credibility of *medical experts* as well as lay witnesses and weigh their opinions accordingly.'" *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (quoting *Scott v. Heckler*, 770 F.2d 482, 485) (5th Cir. 1994) (emphasis added)).

139 S. Ct. at 1152 (citing §§ 404.1560(c)(1), 416.960(c)(1); *see* §§ 404.1566, 416.966).  "For

guidance on such questions, ALJs often seek the views of 'vocational experts.'"[35]  *Biestek*, 139 S.

Ct. at 1152 (citing §§ 404.1566(e), 416.966(e); SSA, Hearings, Appeals, and Litigation Law

Manual I–2–5–50 (Aug. 29, 2014)).

> The Supreme Court has recently described the role of the vocational expert as follows:

> Those experts are professionals under contract with SSA to provide impartial testimony in agency proceedings. *See id.*, at I–2–1–31.B.1 (June 16, 2016); *id.*, at I–2–5–48.  They must have "expertise" and "current knowledge" of "[w]orking conditions and physical demands of various" jobs; "[k]nowledge of the existence and numbers of [those jobs] in the national economy"; and "[i]nvolvement in or knowledge of placing adult workers[ ] with disabilities[ ] into jobs." *Id.*, at I–2–1–31.B.1. Many vocational experts simultaneously work in the private sector locating employment for persons with disabilities. *See* C. Kubitschek & J. Dubin, Social Security Disability Law & Procedure in Federal Court § 3:89 (2019).  When offering testimony, the experts may invoke not only publicly available sources but also "information obtained directly from employers" and data otherwise developed from their own "experience in job placement or career counseling." Social Security Ruling, SSR 00–4p, 65 Fed. Reg. 75760 (2000).

*Biestek*, 139 S. Ct. at 1152–53.  Stated another way, "[t]he value of a vocational expert is that he

[or she] is familiar with the specific requirements of a particular occupation, including working

conditions and the attributes and skills needed." *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000).

---

[35] "Among the sources of evidence that the Commissioner consults to determine when claimants can perform alternative, available work are vocational experts and a United States Department of Labor publication title the Dictionary of Occupational Titles (DOT)." *Gaspard v. Soc. Sec. Admin. Comm'r*, 609 F. Supp. 2d 607, 612 (E.D. Tex. 2009).  The Court in *Gaspard* went on to explain:

> The *DOT* and its supplement, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO),* comprise a comprehensive listing of job titles in the United States, along with detailed descriptions of requirements for each job, including assessments of exertional levels and reasoning abilities necessary for satisfactory performance of those jobs. The Commissioner recognizes the *DOT/SCO* publications as authoritative, and routinely relies on them "for information about the requirements of work in the national economy." Soc. Sec. R. 00–4p, 2000 WL 1898704, at *2.

*Id.* at 612-13.

The testimony of the vocational expert "would be the kind of evidence—far 'more than a mere scintilla'—that 'a reasonable mind might accept as adequate to support' a finding about job availability." *Biestek*, 139 S. Ct. at 1155 (quoting *Consolidated Edison* v. N.L.R.B., 305 U.S. 197, 229 (1938)). "The inquiry, as is usually true in determining the substantiality of evidence, is case-by-case." *Biestek*, 139 S. Ct. at 1157 (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (rejecting a categorical rule pertaining to the substantiality of medical reports in a disability hearing)). "It takes into account all features of the vocational expert's testimony, as well as the rest of the administrative record." *Biestek*, 139 S. Ct. at 1157. "And in so doing, it defers to the presiding ALJ, who has seen the hearing up close." *Biestek*, 139 S. Ct. at 1157.

At the evidentiary hearing,[36] the vocational expert, William Elmore, explained that he has "been a voc[ational] rehab counselor since 1983." (Tr. 56.) Plaintiff did not challenge or object to Mr. Elmore's qualifications. (Tr. 50.) As noted, at the hearing the ALJ asked the following hypothetical:

> All right, Mr. Elmore, I'd like you to assume a hypothetical younger individual with a limited education and past work as you've described with a residual functional capacity to perform sedentary work, except that the individual can balance, stoop, and climb ramps occasionally, but never kneel, crouch, crawl, or climb stairs, ropes, ladders, or scaffolds. The individual can perform tasks that never require exposure to hazards, such as machinery that requires agility to evade or to unprotected heights. It does not appear that this individual could perform any of the claimant's past work. Is that correct?

(Tr. 54.) Mr. Elmore responded "[y]es, ma'am." (*Id.*) The ALJ continued, asking Mr. Elmore "[i]s there other work the individual could perform"? (*Id.*) In response, the VE identified the

---

[36] Significantly, the ALJ complied with the suggestion in SSR 82-61 that "it may be necessary to utilize the services of a vocational specialist or vocational expert." 1982 WL 31387 (1982). The ALJ heard testimony from a vocational expert at the hearing. *See Adams v. Astrue*, No. 08-135, 2009 WL 774845, at *8 (W.D. La. Mar. 24, 2009) (ALJ fully complied with SSR 82-61 when he employed the use of a VE at the evidentiary hearing).

following three jobs: 1) *Addresser*[37] - 10,000 jobs available nationally); 2) *Document Preparer*[38] - 60,000 jobs available nationally; and        3) *Table Worker*[39] - 3,000 jobs available nationally. (Tr. 54-55 (emphasis added).)

The Social Security Administration requires that before an ALJ may rely on the testimony of a vocational expert, he must "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [the] VE [ ] and information in the Dictionary of Occupational Titles (DOT), . . . , and Explain in the determination or decision how any conflict that has been identified was resolved." SSR 00-4P, 2000 WL 1898704, at *1 (2000). In response

_____

[37] In the DOT, the position of addresser is described as follows: "209.587-010 ADDRESSER (clerical) alternate titles: addressing clerk; envelope addresser – Addresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing. May sort mail." *Read v. Comm'r , Soc. Sec.*, No. GJH-15-2684, 2016 WL 2610117, at *5 (D. Md. May 6, 2016) (same).

[38] The DOT describes the job of "Document Preparer, Microfilming (business ser.)" as follows:

> Prepares documents, such as brochures, pamphlets, and catalogs, for microfilming, using paper cutter, photocopying machine, rubber stamps, and other work devices: cuts documents into individual pages of standard microfilming size and format when allowed by margin space, using paper cutter or razor knife. Reproduces document pages as necessary to improve clarity or to produce one or more pages into single page of standard microfilming size, using photo copying machine. Stamps standard symbols on pages or inserts instruction cards between pages of material to notify microfilm-camera operator ... of special handling, such as manual repositioning, during microfilming. Prepares cover sheet and document folder for material and index card for company files indicating information, such as firm name and address, product category, and index code, to identify material. Inserts material to be filmed in document folder and files folder for processing according to index code and filming priority schedule.

*Hardy v. Comm'r of Soc. Sec.*, No. 3:20-cv-88, 2021 WL 2695354, at *3 (N.D. Miss. June 30, 2021).

[39] "In the DOT, a table worker is defined as a person who '[e]xamines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard tiles.'" *Powell v. Kijakazi*, No. 3:21-cv-2226, 2023 WL 2563738, at *15 (N.D. Tex. Feb. 27, 2023) (quoting Dep't of Labor, D.O.T. 739.687-182, 1991 WL 680217 (G.P.O. 1991)).

to the ALJ, Mr. Elmore confirmed that his testimony was "consistent with the DOT and the SCO," and that his opinion was otherwise based on his "[t]raining and experience." (Tr. 56.) Here again, Plaintiff did not challenge or object to the underlying basis for the VE's testimony at the hearing.

In her decision finding that Plaintiff failed to meet his burden to show that he is disabled, the ALJ stated the following:

> Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. The vocational expert affirmed that his testimony was consistent with the Dictionary of Occupational Titles (DOT) and the Selected Characteristics of Occupations (SCO), and that to the extent he was asked to opine on matters not addressed by the DOT or SCO, his opinion was based upon his education, training, and experience as a vocational consultant.

(Tr. 24.)

As the Fifth Circuit has recognized, "the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so." *Carey*, 230 F.3d at 146. "Moreover, claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey*, 230 F.3d at 146-47.

As noted, at the evidentiary hearing the VE testified that Plaintiff was able to perform the exertional demands of a table worker, which has approximately 3,000 jobs available nationally. (Tr. 54-55.) Plaintiff stresses that even if that were the case, 3,000 table worker jobs does not represent a "significant" number in the national economy. (Docket No. 12, at 16-17.) The Commissioner disagrees, arguing that "the remaining job as a table worker (3,000 jobs nationally) constitutes a significant number of jobs, individually." (Docket No. 13-1, at 20.)

To begin with, "[t]he standard for work that exists in 'significant numbers' in the national economy is not a high one." *Read*, 2016 WL 2610117, at 6 (citing *Lawler v. Astrue*, No. 09-1614, 2011 WL 1485280, at *5 (D. Md. Apr. 19, 2011) (finding that the fact that there were only 75-100 jobs in the region where plaintiff lives "does not undermine the ALJ's conclusion that plaintiff is capable of performing work that exists in significant numbers in the national economy"); and *Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979) (declining to determine that 110 regional jobs would be an insignificant number)). In fact, the inquiry into whether a job exists in "significant numbers in the national economy" is one of "common-sense." *Dominguez v. Astrue*, 286 F. App'x 182, 188 (5th Cir. 2008).

Here, 3,000 "counter supply worker" jobs in the national economy would amount to just 270 in the Texas. *See* https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-total.html (Texas represents roughly 9% of the United State population). As the District Court noted, "[t]he Commissioner's position that 3,000 table worker jobs nationally is significant is *unsupported by persuasive caselaw*." (Docket No. 17, at 2 (emphasis added).) For example, other courts have found greater numbers insufficient. *See Merical v. Sec'y of Health and Human Serv.*, 892 F. Supp. 843, 846-47 (E.D. Tex. 1995) (finding that 870 jobs in Texas was not a "significant number"); *John C. v. Saul*, No. 4:19-CV-4111, 2021 WL 794780, at *5-6 (C.D. Ill. Mar. 2, 2021) (finding that the Commissioner has failed to show that 20,000 jobs was a significant number); *Adrienne W. v. Berryhill*, No. 3:17-CV-1218, 2018 WL 4403467, at *1, 3-4 (N.D. Tex. Aug. 24, 2018) (finding 33,000 (collectively) insignificant); *Gretta H. v. Kijakazi*, No. 3:21-CV-3052-BT, 2022 WL 18107079, at *4 (N.D. Tex. Dec. 30, 2022) (finding 20,900 (collectively) insignificant)). As such, the ALJ erred in relying on the testimony of Mr. Elmore to establish that there existed in

the national economy—*in significant numbers*—"counter supply worker" jobs that Plaintiff was capable of performing.

Next, as one Court put it, there is uncertainty as to "which of those job listings in the DOT are reliable," which lends credence to the notion that "some or even many of the jobs described in the DOT are now so obsolete [such] that an ALJ's reliance on a VE's citation to them cannot be considered substantial evidence." *Thomas D. v. Kijakazi*, No. 20 C 2683, 2023 WL 2561614, at *8 (N.D. Ill. Mar. 17, 2023).[40] Based on the descriptions in the Dictionary of Occupational Titles, Mr. Elmore's testimony at the evidentiary hearing was essentially that 10,000 people nationally are employed addressing mail "by hand or typewriter" and 60,000 people are employed "cut[ting] documents into individual pages of standard microfilming size and format when allowed by margin space, using paper cutter or razor knife."[41] *See Dictionary of Occupational Titles*—Fourth Edition (U.S. Dep't of Lab., Revised 1991). Here, the District Court "is skeptical that such testimony is 'relevant evidence as a reasonable mind might accept as adequate to support' a finding for the Commissioner at step five." (Docket No. 17, at 3 (quoting *see Biestek v. Berryhill*, 139 S. Ct. at 1154).)

To be sure, some courts agree with Plaintiff and have found that the jobs of addresser and document preparer are obsolete. *See Hardy v. Comm'r of Soc. Sec.*, No. 3:20-cv-88, 2021 WL 2695354, at *3 (N.D. Miss. June 30, 2021) (recognizing the job of "document preparer" as obsolete

---

[40] *See also Carey v. Apfel*, 230 F.3d 131, 147 (5th Cir. 2000) ("[N]either the DOT nor the vocational expert testimony is per se controlling, [which] permits a more straightforward approach to the pertinent issue, which is whether there is substantial evidence supporting the Commissioner's determination that this particular person can do this particular job or group of jobs.").

[41] The job "addresser" was last updated in 1977, and the job "document preparer" was last updated in 1986. *Dictionary of Occupational Titles*—Fourth Edition (U.S. Dep't of Lab., Revised 1991) ("Addresser" at 209.587- 010; "Document preparer" at 249.587-018).

and also stating that other courts have found the job of "addresser" to be virtually obsolete); *Morgan v. Kijakazi*, No. 22-cv-1085, 2023 WL 4035060, at \*9 (E.D. La. May 15, 2023) (recognizing that "numerous courts . . . have held the 'addresser' job is obsolete"); *Read v. Comm'r, Soc. Sec.*, No. GJH-15-2684, 2016 WL 2610117, at \*6 (D. Md. May 6, 2016) (same); *Fields v. Comm'r of Soc. Sec.*, No. 1:21-cv-133, 2022 WL 1599437, at \*3 (N.D. Miss. May 20, 2022) (finding the job of "document preparer" as obsolete).

Given the fact that the jobs of addresser and document preparer appear to be largely obsolete,[42] and because the job of counter supply worker does not exist in significant numbers in the national economy, the ALJ's reliance on the VE's testimony is not supported by substantial evidence. As such, Plaintiff's claim that the ALJ committed reversible error by finding that he is "capable of making a successful adjustment to other work that exists in significant numbers in the national economy" has merit, and this case should be remanded back to the Commissioner for further proceedings. *See Gretta H.*, 2022 WL 18107079, at \*5 (the Court reversed the final decision of the Commissioner and remanded the case for further proceedings); *Adrienne W.*, 2018 WL 4403467, at \*1, 3-4 (same).

### III.  CONCLUSION

---

[42] To date, the Fifth Circuit does not appear to have specifically addressed this issue. Recently though, the Fifth Circuit declined to find that the job of "addresser" was obsolete because there were other jobs that the claimant could perform in the national economy, which was "sufficient to satisfy the Commissioner's step-five burden." *Owen v. Kijakazi*, No. 21-60545, 2022 WL 118427, at \*3 (5th Cir. Jan. 11, 2022). However, that is not the case here. In *Owen v. Kijakazi*, the Fifth Circuit also confirmed that the court should not "categorically reject the vocational expert's testimony as unreliable based on his opinion that a job is in the national economy." *Id.* (citing *Biestek*, 139 S. Ct. at 1157); *see also Shaw v. Kijakazi*, No. 3:21-cv-252, 2022 WL 2679432, at \*3 (N.D. Miss. July 11, 2022) (Even assuming the job of addresser is obsolete, the plaintiff failed to demonstrate reversible error because there were other jobs in significant numbers that the plaintiff could perform). But in Owen and Shaw, "the remaining jobs nationally amounted to 125,000 and 43,000 respectively." (*See* Docket No. 17, at 2.) In contrast, here as noted, the "counter supply worker" jobs would amount to only 270 in the Texas.

For the foregoing reasons, the undersigned recommends that the Commissioner's decision be **REVERSED** and that this action be **REMANDED** for further proceedings consistent with this opinion.

Due to the detailed medical information summarized in this report, it is **ORDERED** that the Clerk shall file this Report and Recommendation under **SEAL**.

## <u>NOTICE TO THE PARTIES</u>

The Clerk shall send copies of this Report and Recommendation to the parties who have fourteen (14) days after receipt thereof to file written objections pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in this Report and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

DONE at McAllen, Texas on September 13, 2023.

Nadia S. Medrano
UNITED STATES MAGISTRATE JUDGE